UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ORRIN LYNN TOLLIVER, JR. p/k/a<br>DAVID PAYTON,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES LOUIS MCCANTS, an individual doing business as JIMI MAC MUSIC and OG MUSIC; CHERRY RWER MUSIC COMPANY; WILL I AM MUSIC, INC; WILL ADAMS; and UMG RECORDINGS, INC.,<br><br>Defendants. | **Civil Action No.** 05-10840 (JFK) |

---

**DECLARATION OF JAY L. BERGER SUBMITTED: (1) IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND (2) IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

I, JAY L. BERGER, hereby declare as follows:

**1.** I submit this declaration: (i) in opposition to the motion for summary judgment filed by defendant James Louis McCants ("McCants"); and (2) in support of the motion for summary judgment filed by Plaintiff Orrin Lynn Tolliver, Jr. ("Tolliver").

**A. Current Position and Education**

**2.** I graduated from the State University of New York at Binghamton in 1985 with a bachelors of arts degree in Political Science.

**3.** I received my juris doctor, with distinction, in 1988 from the University of the Pacific, McGeorge School of Law.

1

4.     Prior to 1998, I was engaged in private practice as an attorney, and then worked in the counsel department at the New York Life Insurance Company.

## B.     Relevant Experience

5.     Since 2000, I have been the Senior Artist Representative at Artist Rights Enforcement Corp. in New York City.

6.     As the Senior Artist Representative at Artists Rights Enforcement Corp., I represent more than five hundred (500) clients, among which are recording artists and songwriters.

7.     A large portion of my time is spent reviewing potential streams of income for clients, reviewing royalty reports to determine how individuals are being compensated, ensuring that the clients are being properly accounted to and negotiating and drafting various types of music industry contracts such as licenses covering synchronization, mechanical uses, master uses and sample and interpolation uses.

8.     Additionally, I spend a great deal of time negotiating business relationships on behalf of clients and counseling clients with respect to administration of their rights. This work relies on utilization of music industry custom and practice, both in terms of its history and how it is evolving.

9.     Over the last nine (9) years, I have reviewed and/or negotiated more than five hundred (500) songwriter and publishing contracts in various genres of music.

10.     Over the last nine (9) years, I have reviewed and/or negotiated more than five hundred (500) license agreements, including sample and interpolation agreements.

**11.** Over the last nine (9) years, I have reviewed more than two thousand (2000) artist, songwriter and publisher royalty reports from record companies and performing rights societies.

**12.** Over the last nine (9) years, I have re-constructed several hundred (and certainly over two hundred) artist, songwriter and publisher accounts based on accounting, contract and marketplace information.

**C.     Prior Testimony and Expert Experience**

**13.** I was designated as an expert witness and provided trial testimony in the matter Alejandro Lopez v. Musinorte Entertainment Corporation, et al., Case No. CV03-167 TUC-DCB, in the United States District Court for the District of Arizona. My testimony in that case focused on music industry custom and practice and crediting of royalties to artists and song writers. Further, I provided testimony with respect to how to determine copyright ownership and division of copyrights pursuant to music industry custom and practice.

**14.** I was designated as an expert witness and provided trial testimony in the matter entitled Louise Murray, et al. v. Original Sound Record Co., Civil Action No. Cv. 06-7551 PSG (FFMx), in the United States District Court for the Central District of California. My testimony in that case focused on music industry custom and practice with respect to the crediting of royalties to artists.

**15.** I was designated as a witness with specialized knowledge and provided trial testimony as an expert witness in Hawkins, et al. v. Jones, et al., Civil Action No. 00-3785, in the United States District Court for Eastern District of Louisiana. My testimony in that case was

focused on the relationship between songwriters and publishers and the proper amount of compensation as between a songwriter and a music publisher.

16. I was designated as an expert witness and provided testimony in the matter entitled Caesar, et al. v. Sugarhill Music Publishing Company, et al., Case No. 01 Civ. 6180 (RMB) in the United States District Court for the Southern District of New York. My expert report and testimony in that case dealt with licensing musical compositions and recordings, for use as samples, distribution, interpolations and synchronization.

17. I was designated as an expert witness and provided testimony in the matter entitled Rosenblatt et al. v. Laguna et al., Case No. 01- 604012/01, in the Supreme Court for the State of New York, New York County. My expert report and testimony was on music industry custom and practice with respect to music licensing and compensation to musical producers and songwriters for the licensing and distribution of musical compositions.

18. I was designated as an expert witness and provided testimony, in the matter entitled Industrial Strength et al. v. Earache et al., 01-Civ.7325 (JES), in the United States District Court for the Southern District of New York. My expert report and testimony was on the issue of the licensing of master recordings and musical compositions.

19. I was designated as an expert witness and provided testimony in the case Curtis Brown et al v. Columbia Recording Corporation, Case No. 03Civ.6570, in the United States District Court for the Southern District of New York. My expert report and testimony in that case dealt with calculating the income from exploitation of musical compositions and recordings from samples.

**20.**     I was designated as an expert witness in the case <u>Eddie Holman v. Toyota Motor</u>

<u>Company, et al.</u>, Civil Action No. 06 C2712, United States District Court for the Northern

District of Illinois. My expert testimony focused on the amounts due a recording artist for use of

his vocal performance in a television commercial; and

**21.**     I was designated as an expert witness in the case <u>Chad Stuart, et al. v. Mobile</u>

<u>ESPN LLC, et al.</u>, Civil Action No. 06-cv-06862 (RCC), United States District Court for the

Southern District of New York. My expert testimony focused on the amounts due a recording

artist for use of his vocal performance in a television commercial.

## D.     <u>Publications</u>

**22.**     Over the last ten years I have written one article. That article, which was co-

written with Oren J. Warshavsky, Esq., focused on recent judicial developments in copyright

infringement treatment for digital sampling of music, was titled <u>Will Case Change Law on</u>

<u>Sampling</u> and was published in the National Law Journal on October 14, 2002, Vol. 25; No. 6;

Pg. C1 (October 14, 2002).

**23.**     The aforementioned article was reprinted as <u>Fine Tuning</u>, in the journal titled

Intellectual Property Law & Business, Vol. 02; No. 1; Pg. 41 (January 2, 2003).

## E.     <u>Conclusion on Qualifications</u>

**24.**     I am intimately aware of the intricacies of music licensing, as well as the

computation of royalties and evaluation of music properties. Based on my education and

experience, I believe that I am qualified to submit the instant declaration.

**F.    Materials Reviewed and Relevant Considerations**

**25.**    To form the opinions that I am putting forward herein, I have reviewed the pleadings in this action, deposition testimony, the defendant's moving papers, and the documents provided by both sides in this matter.

**26.**    I am expressing my opinions herein based upon my knowledge of music industry custom and practice.

**G.    Compensation**

**27.**    Although I am an employee of AREC, I do not have an ownership interest in the corporation. Thus, whether AREC ultimately benefits from this action will not have an effect on my compensation. Put another way, the outcome of this action will not impact upon my salary or other compensation from AREC.

**28.**    I am not being compensated for the opinions I express herein.

**H.    Music Industry Custom and Practice Relevant to this Action**

Concept Bands and Concept Albums

**29.**    I have seen Tolliver's testimony regarding his concept of creating a band based upon certain non-musical driven qualities, such as dancing skills, appearance and the ability to create a "character" for members. This is a trend that certainly gained momentum in popular music in the 1980's and 1990's, with bands such as New Kids On The Block, *NSYNC and Backstreet Boys, to name just a few.

**30.**    One of the defining features of these groups is a totally controlled sound – the sound of the recorded music is totally controlled by the producers. This is different than the traditional model where the members of a musical group will be allowed to exercise artistic control over the music choices.

**31.** Tolliver's explanation of his vision for the recording is consistent with what is referred to as a "concept album" in the music industry. Most albums do not have an easily recognizable theme that persists throughout the entire album, which is what differentiates a "concept album" from others. A "concept album" on the other hand would include either a unified theme or the telling of a story. Classic examples of concept albums with a unified theme include: Ray Charles' The Genius Hits the Road (in which each song references one of the United States), and Johnny Cash's Ride This Train (in which each song begins with "Ride this train to..." and tells the story of that city), The Beatles' Sgt. Pepper's Lonely Hearts Club Band and The Who's Tommy.

Recordings versus Compositions

**32.** I have seen McCants' moving papers and compared it with the exhibits. It appears that at some points, McCants conflates musical recordings and compositions. These are very different properties.

**33.** An example I like to use for this is the musical composition "I'm A Believer." This composition was written by Neil Diamond. Neil Diamond also recorded the composition. However, this composition became better known when it was recorded by the musical group The Monkees. Thereafter, this musical composition was recorded by a variety of other music groups. A few years ago, this composition was recorded by a music group Smash Mouth, and, Smash Mouth's recording was then used in the film Shrek.

**34.** Assuming Neil Diamond retained his songwriter interest in the composition, he would receive income as a songwriter for each version of the composition. In addition, for his own recording, Mr. Diamond would receive an artist royalty. However, for the Monkees' version of the composition, while Mr. Diamond would be entitled to income as the songwriter,

7

he would <u>not</u> be entitled to income participation in the Monkees' recording; rather, the Monkees would receive the artist royalty. Likewise, Mr. Diamond would receive income from Smash Mouth's recording as well as the use in <u>Shrek</u>. However, neither he nor the Monkees would be entitled to an <u>artist</u> royalty or to share in the income from the master recording. If a third party wants to use one of these recordings, that third party would need a license for the master and for the composition.

35.     Tolliver's discussion about his relationship with Heat Records (at pages 152-160 of Zarin Dec. Ex. B), whether or not it is accurate, is not the same as his discussion about his relationship with respect to McCants with respect to the composition (at pages 243-44 and 260-64 of Zarin Dec. Ex. B). As is clear, the terms of these "understandings" is vastly different – in one there is non-objective criteria for payment and in the other the split is prearranged. Again, regardless of whether this testimony is accurate, in the music industry there always is a different relationship for a composition than there is for a recording.

36.     Payment from the record company is for use of the <u>recording</u> (not the composition) and is an "artist royalty." In this case, the record company is also McCants. However, the discussions of income from <u>recordings</u> should not be co-mingled with discussions of income from <u>compositions,</u> as they are two very different rights, and treated as such throughout the industry.

<u>Music Exploitation</u>

37.     Once a musical composition is created, there are a few ways in which it can be exploited.

38.     Originally, musical compositions would be written and then recorded either by the songwriter or by a different musician. In some cases, the same musical composition would be recorded by the various musicians.

39.     Until the 1970's the traditional way for exploiting musical compositions was through sheet music and the sale of "music carriers." The term "music carriers" is the coextensive with the Copyright Act's definition of "phonorecords" and essentially includes all media which can be sold to the public, such as compact discs, MP3's, cassettes and vinyl records.

40.     In the 1970's studios began using previously released recordings in films and on television shows. Generally, the movie American Graffiti is credited with being the first motion picture to utilize previously released recordings for the purpose was to creating a certain mood; essentially, the "feel" of the 1950's could be achieved, in part, by using recordings that were popular in the 1950's. Of course musical compositions were included in movies and on television prior to that time, but, generally speaking, the musical compositions were written specifically for the movie or television show in which it was included, or the artist actually was filmed performing the composition as part of the film or television program.

41.     Since the 1970's licensing compositions has become a significant source of income. Licensing to television shows, for use in advertisements and in motion pictures are all manners in which a composition is exploited to generate income.

42.     The 1970's saw another source of significant income for certain musical compositions and recordings – compilation albums. A compilation album is an album featuring recordings by multiple recording artists.

43.     Although compilation albums existed prior to the 1970's, they became much more popular in the 1970's, with companies dedicated only to releasing such albums. The rate for the use of previously released compositions is set by Congress (see 17 U.S.C. § 115; 37 C.F.R. § 255), provided that certain formalities are met.

44.     In the early 1980's most so-called "urban" music, which includes music in the "rap" or "Hip-hop" genre, was released on vinyl records as a single, a so-called maxi-single, or a full album.

45.     Another source of income for musical compositions is from public performances.

46.     Every time a musical composition is performed publicly, the owner of the musical composition is supposed to be paid. A public performance can include a concert, a performance at a bar or a night-club, radio airplay, jukeboxes, television, etc.

47.     There are a few non-profit performance rights organization that protect license musical compositions and then monitor the public performances of those compositions. The major three companies that do this work in the United States are known by their acronyms ASCAP, BMI and SESAC.

48.     With the advent of Hip-hop, another source of income has been through the creation of a derivative work. In this genre there are two types of derivative works - "sampling" and "interpolation." "Sampling" is the act of taking a portion (i.e. a sample) of one sound recording and reusing it as an element of a new recording. Put another way, a piece of an actual existing recording is taken and used in a new recording. Interpolation occurs when an artist uses a melody or lyrics from a previously recorded song - but re-creates the sound rather than using the pre-existing recording.

## Songwriter and Publisher Splits

49.     The music industry custom and practice is to split income generated by a music composition into two equal portions. For income purposes, the composition is "split" into two equal halves; one is referred to as the "songwriter" share and the other is referred to as the "publisher" share.

50.     In industry parlance, when speaking about the income generated by a musical composition, one refers to the songwriter's share as the "writer's" and the publisher's share as the "publishing."

51.     If, for example, a musical composition generates $100.00, the "writer's share" is $50.00 and the "publisher's share" is $50.00.

52.     This financial split is a basic, but important, concept, because in many cases there are situations – such as here – where there is more than one "publisher." In a co-publishing deal, the different co-publishers receive percentages of the "publisher's share" of income, but not a percentage of the writer's share. Thus, using the above example wherein a composition generates $100.00, if there are two publishers, the writer would still receive $50.00 and each publisher would receive $25.00.

53.     It is common for independent record labels to require artists to enter into this type of income split with the record label. Put another way, it is common for an independent record label to make an artist that is also a songwriter provide the owner of the record label with an income interest in the composition.

54.     This concept is not hard to understand. The record label's goal is to reduce the amount of money payable from record sales. The record label is required to pay a compulsory license (unless the parties agree otherwise). Currently, that rate is $0.091 per composition per unit. This is often called a mechanical royalty. If the record company can keep 50% of the "publisher's share" of mechanical royalty income, it saves 25% of the amount it would otherwise be required to pay.

55.     Tolliver's testimony is clear that he believed McCants was entitled to a twenty-five (25%) income interest, based on Tolliver receiving the writer's share and the two parties splitting the publisher's share.

56.     This also is consistent with the BMI application made out by McCants' company in 1983, wherein McCants' company is provided a 25% income interest from BMI, with the remaining 75% of the income credited to Tolliver.

Practical Application

57.     If there was a use of the original recording of "I Need A Freak," for instance on a compilation album, and the use was by a party that acted properly, all of the following would need to occur.

58.     The party putting out the compilation would need to secure a license for use of the recording. This would come from McCants' company Heat Records if it still exists. In turn, Heat Records would issue an artist royalty based upon its contract, assuming it has one.

59.     The party putting out the compilation would also need a license for the Composition – which it could either attain by using the statutory scheme or trying to negotiate different terms. Out of that income, Tolliver would receive 75% and McCants 25%.

## Ownership and Credit

60. Obviously, the music industry custom and practice is informed by an understanding of the Copyright Act. It is understood in the industry that the only way to assign ownership of a composition is by use of a written document that is signed by the songwriter.

61. Income splits are common in the recording industry. In many arrangements a party receives "publishing" income but does not receive an ownership interest in the copyright.

62. In the music industry, the primary way by which a publishing company demonstrates ownership of a musical composition is by registering its copyright. Another way would be by ensuring that copyright notice is affixed. Thus, there are a variety of releases that list parties with a "publishing" income participation, but without copyright notice or a registration, it would be understood that these parties have an income interest, which may or may not be temporary.

63. An income split, like that described in paragraphs 49-59 above does not connote that there is a division of the copyright.

64. In most situations, the passive income interest for these companies allows only for the collection of income, or other rights which would be specifically enumerated in a contract. This type of arrangement can stem from many facets – whether because a new songwriter must agree to the same if he or she wants to have the album released, a songwriter has an uncleared sample, etc.

65. I have seen the album cover at Exhibit H to Scott Zarin's declaration. This album cover bears out the foregoing. Simply put, there is no claim on the album that anyone other than the author, David Payton, is taking credit for ownership of the Composition. To the contrary, there is an identification of the author – David Payton – and three different entities (Ocean to

Ocean Music, Go Music and Jimi Mac Music) that are claiming an interest in the "publisher" share of income. As I understand it, in this situation, McCants is claiming that he exclusively owns this copyright based on his authorship – notwithstanding the fact that Go Music is Tolliver's company and Ocean to Ocean Music is a company that is not a party to this litigation.

66.     Without any notice to the contrary, the understanding in the music industry would always be that the author owns the composition. In this case, the understanding would be that "David Payton" is the owner of the Composition. Because Tolliver has been known as David Payton since the 1970's, and known as David Payton in connection with this composition since 1982 (i.e. through McCants' filing with BMI), there can be no dispute the understanding is that Tolliver is David Payton and the owner of the Composition.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 18, 2008
      New York, New York

_____
              Jay L. Berger