**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------X
ORRIN LYNN TOLLIVER JR. p/k/a      :
DAVID PAYTON,

         <u>Plaintiff</u>,     :

                    No. 05 Civ. 10840 (JFK)

    -against-            :

                    <u>Opinion & Order</u>

JAMES LOUIS MCCANTS, an individual :
doing business as JIMI MAC MUSIC
and OG MUSIC; CHERRY RIVER MUSIC   :
COMPANY; WILL I AM MUSIC, INC.;
WILL ADAMS; and UMG RECORDINGS,    :
INC.,

         <u>Defendants</u>.   :
----------------------------------X


<u>APPEARANCES</u>:

       For Plaintiff Orrin Lynn Tolliver, Jr.:

          Oren J. Warshavsky, Esq.
          Baker Hostetler, LLP
          45 Rockefeller Plaza
          New York, NY 10111

       For Defendant James Louis McCants:

          Scott Zarin, Esq.
          Zarin & Associates P.C.
          1775 Broadway, Suite 2300
          New York, NY 10019


**JOHN F. KEENAN, United States District Judge:**

**JOHN F. KEENAN, United States District Judge:**

## Introduction

In 1982, plaintiff Orrin Lynn Tolliver, Jr., collaborated with defendant James Louis McCants to produce a music album that included a recording of a musical composition entitled, "I Need a Freak." In 2005, McCants licensed the composition to the popular music group, The Black Eyed Peas, for use in their hit single, "My Humps." At issue in this case is whether the grant of the license by McCants infringed upon Tolliver's copyright to the composition.

The parties now cross-move for summary judgment. For the reasons below, plaintiff's motion is granted, and defendant's motion is denied.

## Background

The facts set forth herein are undisputed except where noted.

### I.   The parties

In the early 1980s, Tolliver was a disc jockey and a program director at a radio station in Cleveland, Ohio. (Tolliver Decl. ¶ 12.) He hosted a rhythm and blues music program called the "Lynn Tolliver Show," which aired in Cleveland until 2000. (Id.) Besides being a radio personality, Tolliver has written columns for music industry magazines, promoted records, and authored about fifty musical compositions.

(Id. ¶¶ 11, 15, 17.)  He also started a company called David Payton Music in the 1970s to manage and promote up-and-coming bands and musicians. (Id. ¶ 20.)

Around this time, McCants was an independent record promoter and a friend of Tolliver's. (McCants Dep. Tr. at 63-65, 173).  Together with several of his brothers, McCants owned and operated a music studio in Cleveland called Heat Records, where he and his brothers wrote and recorded music. (Id. at 67.)  He also owned a publishing company called Jimi Mac Music.

## II.  The composition and recording of "I Need a Freak"

Tolliver did not have much success either as a songwriter or a band manager, except for one project involving a hip-hop group called Sexual Harassment. (Tolliver Decl. ¶¶ 17, 20.)  Tolliver formed Sexual Harassment as a "concept band." (Id. ¶ 30.)  Its members were selected primarily based on appearance and choreographic skill rather than musical ability. (Id.)  According to Tolliver's vision, the band members would perform at live shows, but most of their music would be produced and recorded for them by others. (Id. ¶¶ 31, 36.)

Tolliver wanted the group's debut album to focus on a central theme of sexuality and its effects on relationships and love. (Tolliver Decl. ¶ 37.)  Tolliver wrote basic lyrics to all of the musical compositions for the album, including a composition entitled "I Need A Freak" (the "Composition").

- 3 -

(McCants Dep. Tr. at 140.)    Tolliver's inspiration for the Composition was a woman named Lourdes who later became his wife. (Tolliver Decl. ¶¶ 21-23.)

Sometime in 1982, Tolliver approached McCants and asked to use Heat Records to record the Sexual Harassment album, and McCants agreed. (Tolliver Dep. Tr. at 75.)    Tolliver worked with two or three of McCants's brothers to create music for the Composition. (Id. at 96-97; McCants Dep. Tr. at 140.)    McCants admits that he did not write any portion of the Composition's lyrics or music. (McCants Dep. Tr. at 153, 170; McCants Response Memo at 25.)    All of the compositions were then produced and recorded in the studio.

The completed album was titled "I Need A Freak" (the "Album").    It contained recorded performances of six musical compositions, or "tracks."    The first track is a recorded performance of the Composition (the "Sound Recording").    Many of the lyrics on the Sound Recording and the other tracks were sung by Tolliver.

It is important to distinguish the Sound Recording from the Composition.    "Copyright protection extends to two distinct aspects of music: (1) the musical composition, which is itself usually composed of two distinct aspects—music and lyrics; and (2) the physical embodiment of a particular performance of the musical composition, usually in the form of a

- 4 -

master [sound] recording." See Ulloa v. Universal Music and Video Distrib. Corp., 303 F. Supp. 2d 409, 412 (S.D.N.Y. 2004) (internal quotation marks omitted).   It is undisputed that McCants owns the copyright to the Sound Recording but must pay Tolliver artist royalties from sales of it because of his performance as a singer. (Tolliver Decl. ¶ 56; McCants Memo at 2-3.)  The only dispute in this case concerns ownership of the Composition.

### III. The agreements between the parties

No written contracts relating to the Album have surfaced.   McCants claims that his former attorney Joseph Zynczack, Esq., who passed away in May 2005, maintained copies of most written agreements, but none were found in his files. (McCants Dep. Tr. at 115, 155-56.)  The parties have different recollections of the agreements they made twenty-seven years ago.

Both sides recall a recording contract in which McCants agreed to pay artist royalties to Tolliver upon the sale of recordings in which Tolliver performed as a singer. (McCants Dep. Tr. at 153-55, 173-75; Tolliver Dep. Tr. at 81.) McCants admits that this recording contract was the only written agreement between them. (McCants Dep. Tr. at 153.)   Tolliver does not remember if it was in writing. (Tolliver Dep. Tr. at 81.)

With respect to the compositions, McCants claims that they had an "understanding" or a "verbal agreement" whereby Tolliver assigned to McCants any income and credit to which Tolliver would be entitled as a writer. (McCants Dep. Tr. at 158-60, 171-75.)    According to McCants, Tolliver made this assignment because he just wanted to hear the songs on the radio and did not want anyone to know he was involved with the project. (Id. at 171-72.)

By contrast, Tolliver asserts that they had a "gentlemen's agreement" in which McCants would collect and distribute any income generated by the compositions, and that "publishing" of "the whole 'I Need a Freak' project was 50/50." (Tolliver Dep. Tr. at 81-83, 243-44, 246.)    In the briefs, this is referred to as an "administration and co-publishing agreement."    Under the agreement, McCants's publishing company, Jimi Mac Music, would get half of the "publishing" from the Album, and a publishing company owned by Tolliver called "GO Music" would get the other half. (Id. at 186-88)    Tolliver stated that he understood this agreement to mean that McCants would have only a passive income interest in the compositions as an administrator and co-publisher of them. (Id. at 263-64).  According to Tolliver, the agreement did not grant McCants the right to license the compositions or otherwise exploit them without Tolliver's permission. (Id.)

- 6 -

According to undisputed expert testimony in the record, the custom in the music industry is to split income generated by a musical composition into two shares—a "songwriter" share and a "publisher" share. (Berger Decl. ¶ 49.) The publisher share is also referred to as the "publishing." (Id. ¶ 50.) If there is more than one publisher, then the publishing is divided among the co-publishers. (Id. ¶ 52.) In many arrangements, a party takes part in the publishing income but does not receive an ownership interest in the copyright. (Id. ¶ 61.) The only way to assign ownership of the composition is through a written document signed by the songwriter. (Id. ¶ 60.) When an assignment is made, the publisher usually demonstrates its ownership by registering its copyright or giving copyright notice on the album. (Id. ¶ 62) It is understood in the music industry that the songwriter retains ownership of the composition, notwithstanding a split of publishing income, unless the publisher gives notice to the contrary. (Id. ¶ 66.)

At deposition, Tolliver repeatedly stated that he did not remember whether he had any written agreement with McCants. (Tolliver Dep. Tr. at 81-83, 247.) Later on in the deposition, there was an exchange in which McCants's counsel, Scott Zarin, Esq., asked Tolliver if there was a written agreement "regarding the administration of the song I Need A Freak." (Id. at 247.)

The transcript records Tolliver's response as an affirmative, declarative statement, "For publishing." (<u>Id.</u>) Immediately following this response, there was a colloquy among the lawyers about the ambiguity of the word "song" because it could refer to either the Composition or the Sound Recording. (<u>Id.</u> at 248-49.) Zarin then agreed to use the word "composition" instead. (<u>Id.</u> at 249.) In a declaration executed after the deposition, Tolliver contends that he was confused by Zarin's question and in fact gave an interrogative response, but the transcriber mistakenly punctuated it with a period instead of a question mark. (Tolliver Decl. ¶ 57.) In other words, Tolliver was not testifying to the existence of a written publishing agreement, but was asking Zarin if his question referred to a written agreement "[f]or publishing?" (<u>Id.</u>) McCants characterizes Tolliver's explanation as an attempt to retract an admission of a written agreement. (McCants Response Memo at 21 n.12.)

IV.  <u>The Composition's pseudonymous release</u>

The Composition was released as a single in 1982 and as a track on the Album in 1983. The cover of the Album credits "David Payton" as the writer of the Composition. (Warshavsky Decl. Ex. 2). It credits various other names with producing and arranging the compositions. (<u>Id.</u>) There are three publishers listed: "Jimi Mac Music," "GO Music," and a third party called "Ocean to Ocean Music." (<u>Id.</u>) The Album cover does

- 8 -

not bear notice that any of the publishing companies owned copyright to the compositions. (Id.)

Several of the names on the Album cover, including the name "David Payton," are pseudonyms. Tolliver decided on the use of the pseudonyms to conceal his involvement with the Sexual Harassment project. (McCants Dep. Tr. 157-158.) Were his involvement known, rival radio stations might refuse to play the group's music. (Tolliver Decl. ¶ 40.) Furthermore, because he was a well-known radio personality, his association with the group might detract from the "bad boy" and "bad girl" image that he hoped it would project. (Id. ¶¶ 34, 41.)

The parties dispute whether the pseudonyms on the Album cover, including the name "David Payton," referred to Tolliver or McCants. McCants states that he allowed Tolliver to put whatever names he wanted on the Album as "a way to not let people know that Mr. Tolliver was involved with the project." (McCants Dep. Tr. 158.) However, based on their alleged verbal agreement, McCants understood that he would own the rights to all of the compositions on the Album. (Id.)

Tolliver claims that it was he who assumed the alias "David Payton" in connection with the Album, just as he had in past music industry projects. (Tolliver Decl. ¶ 43.) Tolliver's use of the name dates back to the 1970s, when he started a company called David Payton Music to manage up-and-coming bands.

- 9 -

Id. ¶ 20.) He operated the company pseudonymously to avoid giving the musicians he managed the impression that he necessarily would endorse their music on his radio program. (Id.) He chose the name because "David" was the first name of his nephew and "Payton" was the middle name of his favorite uncle. (Id. ¶ 43.)

V.    Registration with BMI

On December 4, 1982, the Composition was registered with Broadcast Music, Inc. ("BMI"), a nonprofit organization that collects income from the public performance of musical compositions on behalf of artists. (Warshavsky Decl. Ex. 3; Berger Decl. ¶¶ 46-47.) An employee of McCants at the recording studio completed and signed the BMI registration form. (Warshavsky Decl. Ex. 3; McCants Dep. Tr. at 196-97.) On the form, "David Payton" is listed as the writer of the Composition. (Warshavsky Decl. Ex. 3.) The address given for "David Payton" is the address where Tolliver's mother lived. (Id.; Tolliver Dep. Tr. at 180-81.)

On October 19, 1983, Tolliver filed affiliation documents with BMI and listed "David Payton" as his pseudonym. (Zarin Decl. Ex. I.) McCants claims to have written compositions under several pseudonyms over the years and believes that these pseudonyms would be listed with BMI. (McCants Dep. Tr. at 156-57.) According to BMI's records,

- 10 -

McCants filed his affiliation documents on October 18, 1979, but did not ever claim the pseudonym "David Payton" for himself. (Zarin Decl. Ex. I.)

VI.  Exploitation of the Composition from 1983 until 2000

Shortly after its release, the Album sold over 100,000 copies. (Tolliver Dep. Tr. at 160-61.)  Tolliver learned of the Album's success from an employee of the company that distributed the Album and from an article in a music industry magazine. (Id. at 159-61, 226-27.)  He claims that he received from McCants several payments of around $500, plus one check in the amount of $16. (Id. at 152-153)  The check is signed by McCants and states that it is for "BMI royalties, 'I Need a Freak.'" (McCants Dep. Tr. at 176.)  According to McCants, he issued the $16 check upon Tolliver's request as a favor to him, because Tolliver wanted to frame the check and hang it on the wall of his office. (Id. at 177, 246-47.)  McCants did not testify to making any $500 payments to Tolliver. (Id. at 246-47; McCants Memo at 6.)  He states that Tolliver was not due any royalties because McCants had not recouped the production costs of the Album. (McCants Dep. Tr. at 246-47.)

Since 1983, BMI has paid Tolliver the writer's royalties that it has collected from public performances of the Composition. (McCants Memo at 5 n.3; Tolliver Dep. Tr. at 205, 208.)  Overall, Tolliver has received approximately $100,000

from BMI.    Most  of  this  income—roughly  $94,000—has  been
generated  since  2006  on  account  of  the  license  granted  to  The
Black  Eyed  Peas.  (Tolliver  Dep.  Tr.  at  208.)    Before  then,
Tolliver  claims  that  income  from  BMI  would  trickle  in  once  in  a
while,  $5  or  $7  at  a  time.  (Id.)

          In  2000,  Tolliver  discovered  that  the  Sound  Recording
was  included  as  a  track  on  a  compilation  album  entitled  "In  Tha
Beginning  .  .  .  There  Was  Rap,"  released  by  Priority  Records.
(Tolliver  Decl.  ¶  63.)    According  to  Tolliver,  he  assumed  that
Priority  Records  had  obtained  a  license  to  the  Sound  Recording
from  McCants  and  that  Tolliver  would  issue  a  license  to  the
Composition.  (Id.  ¶¶  64-65.)    Tolliver  also  expected  to  receive
artist  royalties  from  McCants  for  this  use  of  the  Sound
Recording,  and  retained  an  attorney  after  he  did  not  receive
them.  (Id.  ¶¶  65-66.)

                    VII.  The state court action

          In  a  letter  to  McCants  dated  August  16,  2000,
Tolliver's  attorney  asserted  that  Tolliver  was  the  writer  of  the
Composition  and,  as  such,  was  entitled  to  a  percentage  of  the
money  generated  by  its  use  in  the  album  by  Priority  Records.
(Zarin  Decl.  Ex.  C.)    The  letter  demanded  that  McCants  produce
an  accounting  of  all  the  money  generated  by  the  sales  of  "I  Need
A  Freak"  and  threatened  litigation.  (Id.)    The  letter  also
demanded  that  McCants  place  the  publishing  rights  to  the

- 12 -

Composition back in Tolliver's name and ordered McCants to cease and desist from further interference with Tolliver's rights. (Id.)

In response to the letter, McCants denied licensing the Composition to Priority Records and did not dispute Tolliver's authorship or ownership of it. (Tolliver Decl. ¶¶ 67-68; McCants Rule 56.1 Response Statement ¶ 12.) At his deposition, McCants stated that he is not even aware of the album by Priority Records, nor whether the album includes the Sound Recording as a track. (McCants Dep. Tr. at 215.) No license issued by McCants to Priority Records has been produced.

In November 2000, McCants contacted BMI through Zynczak and claimed that he was "David Payton," that he wrote the Composition, and that Tolliver had no rights to it. (Warshavsky Decl. Ex. 8; McCants Rule 56.1 Response Statement ¶ 8.) McCants did not suggest to BMI that he owned the Composition by virtue of an assignment from Tolliver. (McCants Rule 56.1 Response Statement ¶ 9.) In a letter dated November 21, 2000, BMI rejected McCants's claim of authorship. (Warshavsky Decl. Ex. 8.) The letter noted that Tolliver had listed "David Payton" as his own pseudonym upon his affiliation with BMI in 1983 and that McCants had listed no pseudonyms upon his affiliation in 1979. (Id.) The letter concluded that the Composition would remain as registered, with Tolliver credited

- 13 -

as the songwriter, and that "this is a dispute that must be worked out between the parties." (Id.)  BMI sent a copy of the letter to Tolliver and his attorney. (Id.)

In December 2000, anticipating a dispute, Zynczak prepared affidavits for three of McCants's brothers and two of his colleagues, affirming that McCants rather than Tolliver wrote the Composition. (2nd Zarin Decl. Ex. 1.)  Zynczak's widow found the executed affidavits among his files in the basement of their home in March 2008, after the close of discovery in this case. (Id. Exs. 1-2.)  No evidence suggests that Zynczak or McCants ever filed these affidavits in any court or shared them with Tolliver or his counsel.  Interestingly, these prior sworn statements by McCants's family and friends contradict his own testimony in this case that he did not write the Composition but rather received a verbal assignment of it from Tolliver. (See McCants Dep. Tr. 153, 158-60, 170-75.)  McCants does not attempt to explain this contradiction.  Instead, he merely states that he "does not introduce these affidavits to prove the truth of the matter they assert." (McCants Response Memo at 15.) Tolliver claims that McCants did not claim to be "David Payton" again following BMI's rejection of his authorship claim. (Tolliver Decl. § 71.)

On August 9, 2002, Tolliver filed a copyright registration for the Composition with the U.S. Copyright Office,

specifying that his pseudonym is "David Payton." (Zarin Decl. Ex. D.) The registration became effective on August 30, 2002.

At some point, Tolliver became aware of other third party uses of the Sound Recording on compilation albums and suspected McCants of both failing to pay artists royalties and exploiting the Composition without Tolliver's permission. (Rubin Decl. §§ 13, 22.) McCants and his counsel were provided with copies of Tolliver's copyright registration and took no action to dispute its validity. (McCants Rule 56.1 Response Statement ¶¶ 14-15.) McCants stated that he had nothing to do with the compilation albums and that he did not issue any licenses. (Rubin Decl. § 23; see McCants Dep. Tr. 213-220.)

On December 31, 2003, with the assistance of an attorney from the Artists Rights Enforcement Corporation ("AREC"), Tolliver filed a summons against McCants in New York State Supreme Court, New York County. (Zarin Decl. Ex. E; Rubin Decl. ¶ 18.) The action was for, inter alia, breach of contract and an accounting based on McCants's failure to pay Tolliver artist royalties from use of the recordings. (Zarin Decl. Ex. E; Rubin Decl. ¶ 19.) Tolliver's counsel did not bring suit in federal court for copyright infringement because McCants had denied issuing any licenses to the Composition, and had never claimed to own copyright to it. (Rubin Decl. ¶¶ 21-27.) McCants failed to appear in the state action, and Tolliver did not file

- 15 -

a complaint or obtain a default judgment.  The record does not indicate whether or how this case was resolved.

VIII.   <u>The license to The Black Eyed Peas</u>

On May 19, 2005, McCants granted a license (the "License") to The Black Eyed Peas authorizing them to use portions of the Composition in a composition by them entitled, "My Humps" (the "Derivative Work"). (Zarin Decl. ¶ F.)   The Derivative Work contains an "interpolation," or re-creation, of the Composition's melody.   Under the License, seventy-five percent of the writer's share goes to the songwriter of the Derivative Work, William Adams, and twenty-five percent to the songwriter of the Composition, "David Payton." (<u>Id.</u>)   Similarly, the publishing is divided seventy-five percent to the Derivative Work's publishers, Cherry River Music Co. and Will I Am Music Inc., and twenty-five percent to the listed publisher of the Composition, Jimi Mac Music. (<u>Id.</u>)

The Black Eyed Peas recorded the Derivative Work and included it as a track on an album entitled "Monkey Business," which was released in 2005 by A&M Records, a subsidiary of UMG Recordings.   The album sold over one million copies. (Zarin Decl. ¶ J.)   After the album's success, McCants issued other licenses to entities that wished to use the Derivative Work.

On September 8, 2005, AREC sent McCants a letter objecting to his issuance of the License without Tolliver's

permission, demanding evidence of McCants's interest in the Composition, and threatening further legal action. (Zarin Decl. ¶ J.) When first confronted, McCants denied issuing the License and stated that he had no dealings with Cherry River Music or The Black Eyed Peas. (Rubin Decl. ¶ 29.) Later, he stated that he had issued a license to them, but not for the Composition. (Id. ¶ 30.)

## IX.  The instant litigation

On December 29, 2005, Tolliver filed a complaint against McCants, Cherry River Music, Will I Am Music, Will Adams, and UMG Recordings, alleging one count of copyright infringement against all defendants. Subsequently, Tolliver voluntarily dismissed the other defendants from the case.

McCants initially defaulted but then obtained leave to answer the complaint. In his answer, McCants raised nine affirmative defenses, including that he co-authored the Composition, that Tolliver's claim is barred by the statute of limitations, and that Tolliver's contributions to the Composition belong to McCants under the work-for-hire doctrine. (Answer ¶ 3, 5, 6.) Discovery originally was scheduled to close on December 17, 2007. McCants sought and obtained an extension of discovery in order to get a musicology expert's report on whether the Derivative Work in fact sampled the Composition.

(Tolliver Memo at 20-21.)   No expert report was included with McCants's motion papers.

The instant cross-motions for summary judgment became fully briefed on September 17 2008, and are being considered on submission.   In his motion, McCants abandons his claim that he co-authored the Composition and, instead, claims to own it by assignment. (McCants Memo. at 19-20; McCants Response Memo at 25.)   He also relies on his statute of limitations defense and, for the first time, seeks to raise the defense of laches.

## Discussion

### I.   Summary judgment standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Where the moving party meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

In determining whether there is a genuine issue as to

any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.  To defeat a summary judgment motion, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); see also Contemporary Mission v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (stating that an "opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions") (citations and internal quotation marks omitted). Where it is clear that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight," summary judgment should be granted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

## II.  Tolliver's copyright infringement claim

A claim of copyright infringement requires proof that "(1) the plaintiff had a valid copyright in the work allegedly infringed and (2) the defendant infringed the plaintiff's copyright by violating one of the exclusive rights that 17

- 19 -

U.S.C. § 106 bestows upon the copyright holder." <u>Island Software & Computer Serv., Inc. v. Microsoft Corp.</u>, 413 F.3d 257, 260 (2d Cir. 2005) (internal quotation marks omitted); <u>Lipton v. Nature Co.</u>, 71 F.3d 464, 469 (2d Cir. 1995). Among those exclusive rights is the right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). Copyright ownership initially vests in the author or co-authors of a work, and may be transferred in whole or in part. <u>Id.</u> § 201(a), (d). A transfer of copyright ownership is not valid unless the instrument of conveyance is in writing and signed by the owner of the rights conveyed. <u>Id.</u> § 204(a).

It is undisputed that plaintiff authored the Composition and defendant did not. Therefore, ownership of the copyright vested in plaintiff initially. As a defense, defendant claims that he received an assignment of plaintiff's entire interest in the Composition. To be valid, such an assignment would have to be in writing and signed by plaintiff.

Defendant offers no evidence of a written assignment. He has failed to produce one and, in fact, testified that one never existed. At deposition, he stated that the assignment was made through an "understanding" and a "verbal agreement" with plaintiff. He confirmed that the only written agreement between them related not the Composition but to artist royalties from the sale of the recordings. His testimony about an oral

assignment does not create an issue of material fact.

Unable to offer any proof of a written assignment, defendant attempts to rely on plaintiff's testimony about the administration and co-publishing agreement. This attempt fails because plaintiff testified that this agreement did not transfer the right to license or exploit the Composition. Rather, it merely granted defendant the right to collect and retain part of the publishing income generated by the Composition. Plaintiff's recollection of the agreement accords with undisputed expert testimony in the record about music industry custom with respect to arrangements between songwriters and publishers. Moreover, aside from one confused exchange in the deposition transcript that appears to have been inaccurately recorded, plaintiff testified that the agreement was a "gentleman's agreement" and that he could not remember if it was in writing.

Viewing the record in a light most favorable to defendant, no reasonable juror could find that he received a written assignment of the right to license the Composition for use in the Derivative Work. Therefore, defendant's grant of the License violated plaintiff's copyright. Plaintiff is entitled to judgment as a matter of law on his prima facie infringement claim.

III. <u>McCants's affirmative defenses</u>

A. Statute of limitations

Defendant asserts that this action is barred by the statute of limitations.  He contends that plaintiff knew or should have known back in the year 2000 that defendant was claiming authorship of the Composition, a claim he has since abandoned.  Defendant argues that plaintiff's failure to bring suit within three years of that date bars him from maintaining this action.

Plaintiff responds that his complaint alleges copyright infringement based on defendant's unauthorized issuance of the License in 2005.  Therefore, plaintiff asserts, his claim is timely because he filed it within three years of the infringing act.

This tension between the limitations period for an ownership claim and an infringement claim has confronted courts in this District since the Second Circuit's decision in <u>Merchant v. Levy</u>, 92 F.3d 51 (2d Cir. 1996).  There, the Court of Appeals held that "plaintiffs claiming to be co-authors are time-barred three years after accrual of their claim from seeking a declaration of copyright co-ownership rights and any remedies that would flow from such a declaration." <u>Id.</u> at 56.  The claim accrues when the plaintiff knows or should know of the injury upon which the claim is premised. <u>Id.</u>  The court found that this

- 22 -

rule "promoted the principles of repose integral to a properly functioning copyright market." Id. at 57. Since Merchant, "[c]ourts in this district have extended this rule to parties . . . seeking a declaration of sole ownership," and have held that "[a]n express assertion of sole authorship or ownership [by defendant] will start the copyright statute of limitations running." Barksdale v. Robinson, 211 F.R.D. 240, 244 (S.D.N.Y. 2002) (internal citations omitted).

Reconciling the statute of limitations for an ownership claim with the statute of limitations for an infringement claim presents a "conundrum." 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.05[C] (2008). It is well settled that "each act of infringement is a distinct harm giving rise to an independent claim for relief." Stone v. Williams, 970 F.2d 1043, 1049 (2d Cir. 1992); Merchant, 92 F.3d at 57 n.8. Therefore, the failure to bring an action on earlier infringing acts does not bar prosecution of subsequent acts committed within the prior three-year period. Stone, 970 F.2d at 1050 ("[Plaintiff's] failure to seek relief promptly for violations of her entitlement to renewal copyrights does not make defendants immune from suit for later violations."); 3 Nimmer § 12.05[C] ("If such infringement occurred within three years prior to the filing, the action will not be barred even if prior infringements by the same party as to the same work are

barred because they occurred more than three years previously.")
However, the first element of any infringement claim is
copyright ownership. After Merchant, the question arises whether
a plaintiff who is time-barred from seeking a declaration of
ownership nonetheless may prove ownership in an action seeking
damages for recent acts of infringement.

> Merchant concludes with a footnote emphasizing that
>
> Plaintiffs' [co-authorship] cause of action
> is not based on copyright infringement . . .
> Our holding here does not disturb our
> previous rulings that a copyright owner's
> suit for infringement is timely if
> instituted within three years of each
> infringing act for which relief is sought,
> but recovery is barred for any infringing
> acts occurring more than three years prior
> to suit.

92 F.3d at 57 n.8 (citing Stone, 970 F.2d at 1049-50).
Notwithstanding this footnote, most courts in this District have
held that "[w]here the gravamen of a plaintiff's copyright
claims is ownership, and not infringement, the infringement
claims are barred if the ownership claim is time-barred," even
if the infringing acts occurred within the last three years.
Barksdale, 211 F.R.D. at 246; Big East Entm't, Inc. v. Zomba
Enterps, Inc., 453 F. Supp. 2d 788, 795 (S.D.N.Y. 2006); Ortiz
v. Guitian Bros. Music Inc., No. 07 Civ. 3897, 2008 WL 4449314,
at *3 (S.D.N.Y. Sept. 29, 2008); Newsome v. Brown, No. 01 Civ.
2807, 2005 WL 627639, at *5-6 (S.D.N.Y. Mar. 16, 2005); Minder

Music Ltd. v. Mellow Smoke Music Co., No. 98 Civ. 4496, 1999 WL
820575 (S.D.N.Y. Oct. 14, 1999); cf. Vasquez v. Torres-Negron,
No. 06 Civ. 619, 2007 WL 2244784, at *5 (S.D.N.Y. July 11, 2007)
(finding infringement claim not barred because "the gravamen of
the complaint [was] not clearly one of ownership"); Carell v.
Shubert Org., Inc., 104 F. Supp. 2d 236 (S.D.N.Y. 2000) (stating
that a time bar on an ownership claim does not extinguish the
right to sue for infringement, but ultimately relying on the
conclusion that "the gravamen of plaintiff's copyright claims is
infringement, not ownership"). But see 3 Nimmer on Copyright §
12.05[C] (stating that these cases "offer no satisfactory
resolution" because any "infringement claim is emphatically
dependent upon [plaintiff's] claim of ownership; absent such
proof, one of the two elements of the prima facie case would
evaporate.")

It has been noted with approval that this rule—that
past notice of an ownership dispute can bar all future copyright
claims—creates "something like adverse possession to copyright
ownership." Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir.
1996), cited in Merchant, 92 F.3d at 56. Accordingly, courts
applying this rule have held that the statute of limitations is
not triggered unless the defendant makes an "express assertion"
of adverse ownership, Netzer v. Continuity Graphic Assocs., 963
F. Supp. 1308, 1315 (S.D.N.Y. 1997), or a "plain and express

repudiation" of plaintiff's ownership, <u>Carell</u>, 104 F. Supp. 2d. at 252. This has been found where the defendant registered the copyright in his own name, <u>see, e.g.</u>, <u>Margo v. Weiss</u>, No. 96 Civ. 3842, 1998 WL 2558, at *5 (S.D.N.Y. Jan. 5, 1998); distributed the work with copyright notice identifying himself as the owner, <u>see, e.g.</u>, <u>Rico Record Distributors, Inc. v. Ithier</u>, No. 04 Civ. 9782, 2005 WL 2174006, at *2 (S.D.N.Y. Sept. 8, 2005); or exploited the work for years without paying royalties to plaintiff, <u>see, e.g.</u>, <u>Santa-Rosa v. Combo Records</u>, 471 F.3d 224, 228 (1st Cir. 2006) (barring claim where defendant "openly, and quite notoriously, sold [plaintiff's] records without providing payment to him").

For example, in the main case relied upon by defendant, <u>Big East Entertainment, Inc. v. Zomba Enterprises, Inc.</u>, the plaintiff claimed to own the copyrights to musical compositions written in 1986, and brought suit in 2004 for a declaration of ownership and infringement damages. 453 F. Supp. 2d 788 (S.D.N.Y. 2006). As early as 1991, the plaintiff had been informed by third parties seeking licenses that the defendant was the owner of the compositions. <u>Id.</u> at 794-95. From then on, the plaintiff sent numerous letters to defendant asserting ownership. <u>Id.</u> In response, the defendant "repeatedly advised [plaintiff] that neither [plaintiff] nor his companies own[ed] the copyrights in the [] compositions." <u>Id.</u> at 795.

Sometime in the 1990s, the Copyright Office informed the plaintiff that he could not submit a copyright registration for the compositions because the defendant already owned them. Id. The court in Big East concluded that "[b]y virtue of [defendant's] prior copyright registration and the failure of [plaintiff] to act for over a decade, [plaintiff's] ownership or infringement claims are time-barred." Id. at 796.

Defendant also relies on Minder Music Ltd. v. Mellow Smoke Music Co., No. 98 Civ. 4496, 1999 WL 820575 (S.D.N.Y. Oct. 14, 1999). In that case, the plaintiff had purchased in 1990 an ownership interest in musical compositions written in or around 1975. The purchase contract specified that the defendant was a co-owner of the compositions. In addition, for at least twenty-four years, BMI had considered defendant to be a co-owner of the compositions. Because plaintiff and his predecessors in interest had notice of defendant's co-ownership, plaintiff's suit in 1998 for sole ownership and infringement was time-barred. Id. at *2.

This is not the case here. For over twenty-five years, since the Composition's release, plaintiff has been recognized as "David Payton," the sole author of the Composition, and has received all of the writer's royalties collected by BMI from public performances of the work. Defendant's own employee registered the Composition with BMI in

- 27 -

1982, listing plaintiff's mother's address as the address for "David Payton." Plaintiff then listed the pseudonym as his own upon his affiliation with BMI in 1983. In 2002, plaintiff registered copyright to the Composition and specified his use of the name "David Payton." By contrast, defendant did not attempt to claim the name "David Payton" for himself until 2000. Furthermore, he never attempted to register a copyright for the Composition or challenge the validity of plaintiff's copyright.

Defendant offers three pieces of evidence to establish that plaintiff should have had notice of an ownership dispute back in 2000. First, defendant points to the cease and desist letter that he received from plaintiff's attorney in August 2000, after the Sound Recording was included on the album released by Priority Records. However, in response to that letter, defendant denied licensing the Composition to Priority Records. He did not claim to have the right to issue the license, nor did he protest plaintiff's right to order him to cease and desist from doing so. Defendant's conduct could not have put plaintiff on notice of an ownership dispute.

Next, defendant points to the November 2000 letter from BMI that rejected his claim of authorship. Although plaintiff received a copy of this letter, the official rejection of defendant's claim served to confirm plaintiff's ownership, not call it into dispute. Defendant took no action to challenge

- 28 -

BMI's decision to continue crediting plaintiff with ownership, as it had since 1983.

Finally, defendant points to the declarations executed by his brothers in December 2000, in which they claimed that he rather than plaintiff wrote the Composition. Although these declarations were prepared in anticipation of litigation, they were never filed in any court nor shared with plaintiff or his counsel. Defendant's argument that these secret declarations somehow placed plaintiff on notice of an ownership dispute fails for obvious reasons.

Indeed, defendant initially denied granting the License at issue in this case. Only when confronted with it did he finally claim to be an author of the Composition. After admitting at his deposition that, in fact, he did not write any part of the Composition, defendant then claimed for the first time to own it by virtue of an assignment. Clearly, it is defendant who is attempting to rewrite history here and upset "the principles of repose integral to a properly functioning copyright market." Merchant, 92 F.3d at 57. Therefore, defendant's statute of limitations defense fails as a matter of law.

B. Laches

In this motion, defendant raises for the first time the affirmative defense of laches. He claims that plaintiff

learned in 1983 that the Album had sold over 100,000 copies, but never brought an action for unpaid royalties. Defendant asserts that this delay prejudiced him because now he cannot find the supposed administration and co-publishing agreement, and his former attorney who may have drafted the agreement has passed away. Furthermore, defendant claims that the delay has "lulled [him] into a false sense of security regarding his ownership rights to the [C]omposition." (McCants Memo at 28.)

The failure to plead an affirmative defense ordinarily results in a waiver of it. See Maritime Admin. v. Cont'l Illinois Nat'l Bank and Trust Com. of Chicago, 889 F.2d 1248, 1253 (2d Cir. 1989). However, the court may construe a summary judgment motion as a motion to amend the answer to add an unpleaded defense, and should grant such a motion in the absence of undue prejudice to plaintiff, futility, or bad faith, dilatory motive, or undue delay on defendant's part. See Mooney v. New York, 219 F.3d 123, 126 n.2 (2d Cir. 2000); Belgrave v. Pena, 254 F.3d 384, 387 (2d Cir. 2001).

Defendant originally pleaded nine affirmative defenses. Throughout this litigation, he repeatedly changed his position as it became clear that no evidence supported it. He first denied issuing the License, then claimed in his answer that he co-authored the Composition and that he owned it under the work-for-hire doctrine, and then extended discovery to try

- 30 -

and obtain a musicology expert's report that the Derivative Work did not even sample the Composition.    When none of these theories panned out, he claimed for the first time on this motion that he owned the Composition by virtue of an assignment from plaintiff.    He testified at deposition that this was an oral assignment.    Nonetheless, he now seeks to add a laches defense based on the supposed loss of a written assignment that, by all accounts, never existed.

Plaintiff had no notice of this latest defense until this motion, two-and-a-half years into the litigation.    All of the facts relevant to a laches defense should have been known to defendant at the outset of this case, and he has offered no explanation for the delay.    Plaintiff did not have an opportunity to conduct discovery with a view to disproving laches, and would be unduly prejudiced by an amendment at this late stage.

Furthermore, amendment would be futile because a laches defense would fail on the merits as a matter of law.[1] "The defense of laches bars a claim when a defendant has

_____

[1]    The parties dispute whether the doctrine of laches is even available where the claim is brought under a federal statute containing an express statute of limitations.  See Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc., 452 F. Supp. 2d 382, 392 (S.D.N.Y. 2006) (noting that "the role of laches in barring a copyright infringement claim is uncertain" in the Second Circuit).    The Court need not resolve this question because, assuming that a laches defense is available, defendant's claim presents no genuine issues of material fact.

suffered prejudice because of a plaintiff's unreasonable and inexcusable delay in bringing the claim." Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc., 452 F. Supp. 2d 382, 391 (S.D.N.Y. 2006) (citing New Era Publ'ns Int'l v. Henry Holt & Co., 873 F.2d 576, 584 (2d Cir. 1989)). With respect to delay, defendant's contention that plaintiff should have brought an action to recover unpaid royalties back in the 1980s is undermined by defendant's own testimony that he did not owe plaintiff royalties because the Album did not generate income sufficient to cover its costs of production. Plaintiff brought this motion eight months after defendant licensed the Composition to The Black Eyed Peas, the first time that defendant conspicuously violated plaintiff's copyright. There was no undue delay.

        With respect to prejudice, defendant testified that he and plaintiff had no written agreement relating to the Composition, only an "understanding" and a "verbal agreement." Defendant cannot now speculate about the loss of a written assignment that, according to him, never existed. Likewise, defendant cannot claim to have been lulled by plaintiff's failure to demand royalties because defendant testified that no royalties were owed. Moreover, defendant should have known since 1983 that BMI was paying writer's royalties to plaintiff,

precluding defendant from reasonably forming any "false sense of security" regarding his rights to the Composition.

### Conclusion

For the reasons above, plaintiff's motion for summary judgment on his claim of copyright infringement and on defendant's affirmative defenses is granted, and defendant's cross-motion is denied. Counsel are directed to appear in Courtroom 20-C at 10:00 a.m. on May 1, 2009, for a conference on the issue of damages.

**SO ORDERED.**

**Dated:     New York, New York**
**           March 25, 2009**

_John F. Keenan_

**JOHN F. KEENAN**
**United States District Judge**