```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ORRIN LYNN TOLLIVER, JR. p/k/a           :
DAVID PAYTON,                            :
                                         :
               Plaintiff,                :
                                         :
     -against-                           :    Opinion & Order
                                         :    No. 05 Civ. 10840 (JFK)
JAMES LOUIS MCCANTS, an individual       :
doing business as JIMI MAC MUSIC         :
and OG MUSIC; CHERRY RIVER MUSIC         :
COMPANY; WILL I AM MUSIC, INC.;          :
WILL ADAMS; and UMG RECORDINGS, INC.,    :
                                         :
               Defendants.               :
----------------------------------------X
```

APPEARANCES:

    For Plaintiff Orrin Lynn Tolliver, Jr.:

        Oren J. Warshavsky, Esq.
        Baker Hostetler, LLP
        45 Rockefeller Plaza
        New York, N.Y.  10111

    For Defendant James Louis McCants:

        Scott Zarin, Esq.
        Zarin & Associates, P.C.
        1790 Broadway, 10th Floor
        New York, N.Y.  10019

**JOHN F. KEENAN, United States District Judge:**

    In 1982, Plaintiff Orrin Lynn Tolliver, Jr. ("Plaintiff" or "Tolliver") collaborated with Defendant James Louis McCants ("Defendant" or "McCants") on the recording of a musical composition entitled "I Need a Freak" (the "Composition"). In 2005, McCants licensed the Composition to the popular music

1

group the Black Eyed Peas for use in their hit single "My Humps." On March 25, 2009, this Court granted summary judgment in favor of Plaintiff, finding that the license infringed upon Tolliver's copyright to the Composition. On May 26, 2009, the Court subsequently granted Defendant's motion for reconsideration, allowing him to reinstate several affirmative defenses to the copyright infringement claim. McCants then stipulated to dismiss all but two of the reinstated defenses. Before the Court is Plaintiff's motion for summary judgment on the last remaining affirmative defenses: acquiescence and waiver. For the reasons that follow, Plaintiff's motion is granted.

## I. BACKGROUND

Familiarity with the facts and procedural history of this case is presumed. See Tolliver v. McCants, No. 05 Civ. 10840, 2009 WL 1473445 (S.D.N.Y. May 26, 2009) (reinstating affirmative defenses); Tolliver v. McCants, No. 05 Civ. 10840, 2009 WL 804114 (S.D.N.Y. Mar. 25, 2009) (granting summary judgment). The Court will briefly review those facts most relevant to the affirmative defenses at issue, all of which are undisputed except where noted.

### A. The Recording and Release of "I Need A Freak"

In the early 1980s, Plaintiff Tolliver was a disc jockey for a radio station in Cleveland, Ohio. (Tolliver Decl. ¶ 12).

2

In 1982, Tolliver formed a concept band called Sexual Harassment and composed several songs for the group to perform, including "I Need a Freak." (Id. ¶¶ 27, 30). Tolliver recorded the track in McCants' studio at Heat Records (the "Sound Recording"). (Id. ¶¶ 26-27). On December 4, 1982, McCants caused the Composition to be registered with Broadcast Music, Inc. ("BMI"), a nonprofit organization that collects income from the public performance of musical compositions on behalf of artists. (Warshavsky Decl., Ex. D3). This registration lists "David Payton" as the writer of the Composition. (Id.). Although in 2000 McCants attempted to claim the name and ownership of the Composition for himself, (Warshavsky Decl., Ex. D8), the Court has previously established that "David Payton" is a pseudonym used by Tolliver to keep separate his radio personality and concept band endeavor.

The Composition was released as a single in 1982 and as a track on an album also entitled "I Need a Freak" distributed by Montage Records in 1983 (the "Album"). (Tolliver Dep. Tr. at 154). Tolliver testified that McCants had negotiated the distribution agreement with Montage Records. (Id. at 226-27). Shortly after its release, the Album sold over 100,000 copies. (Id. at 160-61). Sometime later in 1983, Tolliver learned of the Album's success from an employee of Montage Records and from an article in a music industry magazine. (Id. at 159-61, 226-

3

27). Despite the fact that a considerable number of records were sold, McCants testified that he was never paid for Montage Records' distribution of the Album. (McCants Dep. Tr. at 104-06).

In 2000, Tolliver discovered that the Sound Recording was included in a compilation album entitled "In Da Beginning . . . There Was Rap," released by Priority Records. (Tolliver Decl. ¶ 63). Tolliver assumed that Priority Records had secured a license for the Sound Recording from McCants, and that he would in turn issue a license for the Composition. (Id. ¶¶ 64-65). In response to an August 16, 2000 cease and desist letter from Tolliver's attorney demanding compensation for the exploitation by Priority Records, McCants denied issuing a license to Priority Records. (Id. ¶¶ 66-68; McCants Dep. Tr. at 215; Warshavsky Decl., Ex. D7). He did not claim that he had the right to issue the license. Indeed, in 2007 McCants testified that he had not authorized any third party to release the original Sound Recording of "I Need a Freak" at any time in the preceding ten years. (McCants Dep. Tr. at 219-20).

On August 9, 2002, Tolliver filed a copyright registration for the Composition with the U.S. Copyright Office. (Warshavsky Decl., Ex. D5).

At some point, Tolliver became aware of additional third party uses of the Composition on compilation albums for which he

had not granted licenses or received royalties.  McCants stated that he had nothing to do with the compilation albums and denied issuing licenses.  (Rubin Decl. ¶¶ 22-23; McCants Dep. Tr. at 213-20).

On May 19, 2005, McCants issued a license to the Black Eyed Peas authorizing the group to use portions of the Composition in their own composition entitled "My Humps."  (Warshavsky Decl., Ex. D10).  In response to a September 8, 2005 letter from Tolliver's counsel objecting to the issuance of the Black Eyed Peas license without permission, McCants initially denied issuing the license, and later stated that he did issue a license to the Black Eyed Peas, but the license covered another song also entitled "I Need a Freak" distinct from the Composition at issue in this suit.  (Rubin Decl. ¶¶ 29-30). While this claim is consistent with his 2007 deposition testimony that he had not authorized any third party use of the original Sound Recording in ten years, several license agreements for "I Need a Freak" (as written by "David Payton," the only song with that title of which the Court is aware), executed by McCants after 1997, including a license to the Black Eyed Peas, have since been produced.

On December 29, 2005, Tolliver filed the instant copyright infringement suit.  In his motion for summary judgment, McCants claimed to own the rights to the Composition through an

5

assignment from Tolliver. In its March 25, 2009 Opinion and Order, this Court found that Tolliver, as songwriter, is the sole owner of the Composition. Furthermore, there was no evidence to support the existence of a written assignment from Tolliver transferring his rights to McCants. Therefore, the Court granted summary judgment on the copyright infringement claim and McCant's affirmative defenses in favor of Tolliver.

**B. Exploitation of a Musical Composition**

By way of background, musical copyrights cover both the composition itself – the music and lyrics of a song – and the master sound recording – the recording of a specific performance of the composition. See 6 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 30.03 (2003). A song can be exploited in several ways; for example, another artist can sample or interpolate part of the song, or the song as originally recorded can be included on a compilation album. (Berger Decl. ¶¶ 42, 48). When a third party wishes to legally exploit a musical composition, he or she must obtain a license for both the master recording and the composition. (Id. ¶ 34). McCants owns the rights to the master Sound Recording; the Court has previously established that Tolliver owns the rights to the Composition.

The songwriter and publisher are entitled to royalties for the use of their work. In the case of "I Need a Freak," written by "David Payton" and performed by Sexual Harassment, if the

6

original recording were, for example, to be properly included in a compilation album, McCants would issue a license for the Sound Recording, and in turn pay Tolliver artist royalties for his rapping performance. (Id. ¶ 58). The third party would also need to secure a license to the Composition from Tolliver. (Id. ¶ 59). It is undisputed that, pursuant to their agreement and in accordance with industry custom, the parties were to split the publishing, or mechanical, royalties earned on the Composition, with Tolliver (as songwriter and co-publisher) receiving 75%, and McCants receiving 25%. (Tolliver Decl. ¶ 58; Berger Decl. ¶ 59; Warshavsky Decl., Ex. D3; Def. Opp. Mem. at 19 n.5).

## II. DISCUSSION

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether there is a genuine issue as to a material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the

material facts . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted). Summary judgment is appropriate when no reasonable trier of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

### A.  Acquiescence

Throughout these proceedings, Defendant has advanced a variety of unsuccessful, and often contradictory, theories in his defense. As the Court noted in its original summary judgment Opinion:

> Throughout this litigation, [McCants] repeatedly changed his position as it became clear that no evidence supported it. He first denied issuing the [Black Eyed Peas] License, then claimed in his answer that he co-authored the Composition and that he owned it under the work-for-hire doctrine, and then extended discovery to try and obtain a musicology expert's report that ["My Humps"] did not even sample the Composition. When none of these theories panned out, he claimed for the first time on this motion that he owned the Composition by virtue of an assignment from plaintiff. He testified at deposition that this was an oral assignment. Nonetheless, he now seeks to add a laches defense based on the supposed loss of a written assignment that, by all accounts, never existed.

Tolliver, 2009 WL 804114, at *13. However, Defendant now argues that Plaintiff's failure to assert his rights to the Composition in 1983 reasonably led Defendant to believe

8

that Plaintiff did not object to his infringing conduct, and Defendant relied on this assurance to his detriment.

There is some dispute about the exact defense asserted and its relevance in copyright infringement actions. In his original answer to the complaint, Defendant stated that "Plaintiff has acquiesced in Defendant's conduct." (Answer at 8). Although Defendant variously styles his defense as "acquiescence," "estoppel by acquiescence," and "equitable estoppel," he attempts to clarify in an improper sur-reply brief that this is in fact an estoppel-type defense. Plaintiff argues that this is an acquiescence defense that only applies in trademark cases. Indeed, all of the caselaw Defendant cites addresses the Lanham Act, not the Copyright Act. However, "principles of estoppel applicable elsewhere in the law are equally applicable in copyright infringement actions," 4 Nimmer on Copyright § 13.07, and there is some minimal support in caselaw for the recognition of an estoppel by acquiescence defense in copyright infringement actions. See <u>Basic Books, Inc. v. Kinko's Graphics Corp.</u>, 758 F. Supp. 1522, 1539-40 (S.D.N.Y. 1991) ("'The plaintiff's acquiescence in the defendant's infringing acts may, if continued for a sufficient period of time and if manifested by overt acts, result in an abandonment of copyright.' In such a case, the estoppel 'destroys the right asserted' and will be a defense for all acts

9

occurring after the acquiescence.") (quoting 4 Nimmer on Copyright § 13.07).  Giving Defendant the benefit of the doubt, the Court construes his papers to argue that by failing to object to the distribution of "I Need a Freak" in 1983, Plaintiff is estopped from asserting a copyright infringement action on the basis of the 2005 Black Eyed Peas license.

Generally, an estoppel defense in copyright actions applies when "the party to be estopped had knowledge of defendant's infringing conduct, and either intended that his own conduct be relied upon or acted so that the party asserting the estoppel has a right to believe it was so intended.  Additionally, the defendant must be ignorant of the true facts and must rely on plaintiff's conduct to his detriment."  Lottie Joplin Thomas Trust v. Crown Publishers, Inc., 456 F. Supp. 531, 535 (S.D.N.Y. 1977), aff'd, 592 F.2d 651 (2d Cir. 1978); see Dallal v. The N.Y. Times Co., No. 05-2924, 2006 WL 463386, at *1 (2d Cir. Feb. 17, 2006); DeCarlo v. Archie Comic Publ'ns, Inc., 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001); Cherry River Music Co. v. Simitar Entm't, Inc., 38 F. Supp. 2d 310, 318 (S.D.N.Y. 1999).[1]

---

[1] Defendant asks the Court to apply the elements of the acquiescence defense as defined in trademark infringement cases, namely that:  (1) the owner actively represented that it would not assert a right or claim against the infringer; (2) the delay between the active representation and the assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice.  See ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d

### 1.  Plaintiff's Knowledge of Infringement

The first question to be resolved is whether Plaintiff knew that Defendant infringed his rights in the Composition by licensing the Composition to Montage Records in 1983.  Plaintiff has consistently maintained that he was unaware of any third party exploitation of the Composition prior to 2000 and any license issued by Defendant other than the Black Eyed Peas license.  However, Defendant points out that Plaintiff knew of the distribution agreement, knew that the Album was in fact distributed by Montage Records in 1983, and knew that the Album sold over 100,000 copies.  However, Plaintiff never issued a license for the Composition for exploitation by Montage Records.  Assuming this distribution arrangement required a license for the Composition, there may be an issue of fact about whether Plaintiff knew, in light of the Album's release, that Defendant licensed the Composition to Montage Records without his permission.  However, this lack of clarity does not defeat summary judgment. See Lottie Joplin Thomas Trust, 456 F. Supp. at 535 (granting summary judgment for plaintiff on defendant's estoppel defense "[e]ven assuming that plaintiff was aware of

---

62, 67 (2d Cir. 2002).  However, the defense as described in copyright law is essentially the same and encompasses the elements Defendant proposes.  To the extent that Defendant's argument centers on delay as opposed to consent, the Court has already rejected this theory, expressed as the defense of laches, on the merits.  See Tolliver, 2009 WL 804114, at *13.

the . . . assignment from its inception"); see also Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104-05 (9th Cir. 1960) (affirming dismissal of estoppel defense in copyright action where trial court assumed that Plaintiff knew of infringing conduct and Defendant was ignorant of the true facts, but found no holding out or reliance).

### 2.   Plaintiff's Conduct

Even if Plaintiff was aware of Defendant's infringing conduct, Defendant has produced no evidence to show that Plaintiff (1) intended to convey his acquiescence to the use of the Composition without permission, or (2) acted in such a way that Defendant reasonably believed he had the right to infringe. Most importantly, Defendant never testified at deposition or otherwise provided a sworn statement to the effect that he believed, at the time he issued the Black Eyed Peas license, that Plaintiff's conduct in 1983 gave him the right to infringe. In fact, Defendant's actions indicate that he likely knew that Plaintiff would object; otherwise, Defendant would have no reason to deny issuing the Black Eyed Peas license or to extend discovery to try to prove that the Black Eyed Peas sampled another song, also entitled "I Need a Freak," and not the Composition.

Defendant points to several sets of facts in support of his argument that Plaintiff intended to convey or gave Defendant

reason to believe that he would not assert his rights in the Composition. First, Defendant argues that, despite Plaintiff's alleged knowledge that he licensed the Composition to Montage Records for inclusion on the Album, Plaintiff never demanded mechanical royalties earned on the 100,000 records sold. Although the right to collect royalties derives from Plaintiff's ownership of the Composition, the failure to demand compensation for third party use of the Composition in no way indicates that Plaintiff intended for Defendant to believe or gave Defendant reason to believe that he could freely license the Composition. Plaintiff's testimony indicates that the decision not to sue for royalties may simply be a business judgment that the cost of litigating outweighs any potential recovery, which does not implicate ownership rights. Next, Defendant argues that Plaintiff explicitly conveyed his acquiescence to Defendant's infringement by declining payment of any kind for the Composition, instead finding ample gratitude in hearing his voice on the radio. This argument is directly contradicted by Defendant's own admission that the parties agreed to split royalties on the Composition, with Plaintiff receiving 75%.

Finally, Defendant argues that, despite his knowledge of the Album's release, Plaintiff never objected to the distribution or required McCants or Montage Records to obtain a license to the Composition. "Although in some instances,

13

silence and inaction may induce justifiable reliance on the part of the defendant, those circumstances are not present when the defendant is in a position to ascertain the extent of the competing claim." Merchant v. Lymon, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993), rev'd on other grounds, 92 F.3d 51 (2d Cir. 1996)). The parties were friends and collaborators, and, as he registered Plaintiff with BMI, credited Plaintiff as the songwriter on the Album cover, and agreed to pay Plaintiff 75% of royalties on the Composition, Defendant was well aware of Plaintiff's claim to the Composition. Even if Plaintiff did fail to object to the distribution of the Album, there is no evidence that Plaintiff's conduct gave Defendant the right to believe – or that Defendant actually did believe – that he could subsequently license the Composition without permission. Additionally, Plaintiff's testimony, the 2000 cease and desist letter, and the 2002 copyright registration clearly indicate that Plaintiff has always believed he had sole licensing authority.

### 3. Defendant's Knowledge of True Facts

There can be no question that Defendant has always known of Plaintiff's rights in the Composition. Defendant caused Plaintiff to be registered with BMI as the writer of "I Need a Freak," and the Album similarly credits "David Payton" – that is, Plaintiff – as the songwriter. The parties agreed that

14

Plaintiff, the songwriter and co-publisher, would receive 75% of any royalties earned on the Composition.  More recently, BMI rejected Defendant's attempt to claim ownership of the Composition by declaring that he, not Plaintiff, used the pseudonym "David Payton."  Defendant admittedly received a copy of Plaintiff's copyright registration for the Composition. Defendant bears the burden of producing evidence to show that he did not know of the true facts – i.e., that Plaintiff did not intend for Defendant to rely on his conduct or otherwise convey his acquiescence.  Defendant has not put forth any evidence establishing his lack of knowledge, and, as previously discussed, the fact that he repeatedly denied issuing various licenses indicates that he very likely knew that Plaintiff maintained and wished to assert his rights in the Composition.

### 4. Defendant's Detrimental Reliance

Finally, Defendant makes an after-the-fact argument that he expended more than $100,000 to record "I Need a Freak" and issued several licenses, specifically the Montage Records license, due to Plaintiff's alleged implicit assurance that he would not assert his rights to the Composition.  Any claim that Defendant relied on Plaintiff's assurances that he wanted to be compensated for the Composition with fame, not money, is unavailing in light of the fact that Defendant agreed to pay Plaintiff artist royalties and to split mechanical royalties.

15

Additionally, Defendant's contention that he would not have recorded the song or licensed the single to Montage Records for distribution in 1983 if not for Plaintiff's conduct is patently impossible, as Plaintiff's alleged acquiescence to that distribution is the very act which supposedly established Defendant's right to issue various licenses.  In other words, Defendant could not have relied upon conduct that had yet to occur – the timing does not add up.

Not only are Defendant's reliance arguments nonsensical, they are also factually unsupported.  Nowhere in the record is there deposition testimony or any other sworn statement that Plaintiff induced Defendant to record "I Need a Freak" by relinquishing his rights to the Composition or that, but for Plaintiff's failure to object to the distribution of the Album, Defendant would not have taken some other action to his detriment.  There is no basis on which a factfinder could conclude that Defendant justifiably relied on Plaintiff's prior conduct in issuing the Black Eyed Peas license.

The Court is mindful of the fact that the record is replete with examples of conduct by Defendant which is totally inconsistent with any reliance on Plaintiff's alleged acquiescence.  If Defendant believed that Plaintiff assented to his infringing conduct, he would have no reason to contest ownership of the Composition, claim to be in possession of a

16

written assignment granting him ownership rights to the Composition, deny issuing licenses for exploitation of the Composition, accuse Plaintiff of identity theft in using the "David Payton" pseudonym, claim to have written another song called "I Need a Freak" separate from the Composition at issue, and so on. Thus, no reasonable trier of fact could find that Defendant had reason to believe or did believe that he could license the Composition to the Black Eyed Peas without permission.

### B.   Waiver

In his Memorandum of Law in Opposition to Plaintiff Tolliver's Motion for Summary Judgment on Defendant's Affirmative Defenses, Defendant states in a footnote that he is abandoning the affirmative defense of waiver. Therefore, the defense is stricken.

### III. CONCLUSION

Plaintiff's motion for summary judgment on McCants' affirmative defense of acquiescence is granted. The parties are directed to appear for a conference on the issue of damages on March 2, 2010 at 11:00 a.m.

SO ORDERED.

Dated:   New York, New York
         January 21, 2010

                                    _____
                                            JOHN F. KEENAN
                                    United States District Judge